IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Docket No. 1:20-cr-10164-NMG

UNTIED STATES OF AMERICA

v.

DIANA LOPEZ
*Defendant*

## DEFENDANT DIANA LOPEZ'S SENTENCING MEMORANDUM

James S. Dilday, Esq. (BBO #124360)
Anthony R. Ellison, Esq. (BBO #567037)
299 Gallivan Boulevard
Boston, MA 02124
Tel. (617) 506-7057
Fax (617) 506-7175
Cell (617) 642-0689
Email: Jamessdilday@gmail.com
Email: Arellisonlaw@gmail.com

*Counsel for Diana Lopez*

TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................3

BACKGROUND ...........................................................................................................3

  A. Personal History and Family ...........................................................................3

  B. Professional Career .........................................................................................4

  C. Offense Conduct .............................................................................................5

ARGUMENT ...............................................................................................................8

  A. Ms. Lopez Should Be Held Accountable For Overtime Paid to Her .........9

  B. Diana Lopez Was Not in a Position of Public or Private Trust...............11

  C. The "Loss" Guideline, § 2B1.1, Yields An Excessive Advisory GSR........13

  D. Just Punishment for Not Require Incarceration ......................................15

  E. A Sentence of Incarceration Would Create Unwarranted Disparity .......16

  F. The Court Should Apportion Restitution .................................................16

CONCLUSION ...........................................................................................................17

CERTIFICATE OF SERVICE ..............................................................................18

APPENDIX...................................................................................................................18

Defendant Diana Lopez respectfully submits this Memorandum, accompanying letters from family, former colleagues, and friends (Exhibit A), to assist the Court with sentencing.

## INTRODUCTION

Diana Lopez is a devoted mother, daughter and sister. She was also a dedicated public servant for more than four decades, a woman who unselfishly placed her life in danger to protect and serve the citizens of the Commonwealth and, more particularly, the City of Boston. The conduct underlying the conviction in this case, which she deeply regrets, cannot and should not erase the laudable aspect of her long and honorable career of service. Ms. Lopez understands that she is standing before the court adjudged guilty of very serious offenses. But she should not be sentenced as the 'face' of the much broader, deeper, and long-standing culture of overtime abuse of the Boston Police Department and the Evidence Control Unit particularly. And while the alleged conduct underlying the conviction is inexcusable, it was truly aberrant in the context of an otherwise exemplary life and law enforcement career. Accordingly, for the reasons described below and pursuant to 18 U.S.C. § 3553 we submit that a sentence of **probation**, forfeiture, restitution, and mandatory special assessment, is sufficient, but not greater than necessary, to accomplish the purpose of sentencing set forth in 18 U.S.C. § 3553 (a).

## BACKGROUND

### A. Personal History and Family

Diana Lopez is 62 years old. Born in Puerto Rico and raised in Boston, Ms. Lopez was the younger of two siblings. Her father abandoned her at the early age of two to be raised in a single parent household. Apparently, her father fell into depression and alcoholism at the time of his departure. He had no hand in her upbring. It is possible that he suffered from PTSD based upon his military background where he had four fingers amputated. Her mother, a strong Latina from Puerto Rico, struggled to make ends meet by working menial, low paying, jobs and the family

relied on public assistance. Ms. Lopez was required to largely fend for herself as a child as her older brother lacked the ability to act as a surrogate parent. Indeed, he became a victim of the streets. Diana subsequently took care of her older brother who later in life became a drug addict. Because family was always important to Diana, she took him into her home as his primary caretaker when he was released from prison in 2007 until his untimely death at the age of fifty-five in 2016. Diana's mother was a diabetic who also suffered from high blood pressure and chronic arthritis. In 2018, Diana took her mother in and became her primary caretaker until she passed away in 2022. She raised her two children after a contentious divorce. Currently, Ms. Lopez cares for her daughter who suffers from ongoing mental health issues. All of Ms. Lopez's family members emphasize her leadership in the family from an early age and her unceasing willingness to help others, as evidenced in the many letters of support that have been submitted on her behalf. Without her presence, her family would surely suffer greatly.

**B. Professional Career**

Ms. Lopez attended St. Patrick's High School, where she graduated and later matriculated to Curry College where she received a bachelor's degree in criminal justice in 2002. She worked in the Roxbury District Court Clerk-Magistrate's office for three years prior to becoming a Boston police officer in July of 1985. Ms. Lopez was one of the early women of color to work in the Boston Police Department. She performed honorably and courageously while on patrol assignments. She worked In District 4 (A-4) upon completing the police academy and later worked out of District 11 (C-11). Ms. Lopez subsequently became a member of the Drug Resistance Education Program (DARE). In that capacity, Ms. Lopez went to schools throughout the City of Boston lecturing to students and educating youngsters about the dangers of drug usage. Subsequently, Ms. Lopez was assigned to the Internal Affairs Office where she was a clerk reporting to the Deputy Superintendent in charge of Internal Affairs. From Internal Affairs, Ms.

Lopez went to District 18 (B-18) and then to the Evidence Control Unit where she worked until she retired in January 2020.

### C. Offense Conduct

The Court heard ample evidence about the offense conduct during the trial of Ms. Lopez's fellow officers who were ultimately acquitted[1]. While there is no excuse for the dishonesty at the heart of overtime abuse, several mitigating considerations provide important context.

First, the culture of overtime abuse at Boston Police Department's Evidence Control Unit was plainly widespread and accepted by the Boston Police Department. This is obvious not only from the multiple prosecutions of police personnel across the unit, but also from external reviews that have been conducted in recent years throughout the Department as a whole. Again, the widespread nature of the conduct does not excuse Ms. Lopez, but highlights the fact that, by facing criminal prosecution and felony convictions, Ms. Lopez has already faced consequences far more severe than many of her former colleagues who engaged in the same or worse conduct. Understand that this is not said to condone her behavior for which she takes full responsibility.

Second, the trial of fellow officers brought out the very nuanced interpretation of overtime pay by the Boston Police Department. It came out at trial that the collective bargaining agreement dictated the overtime allotted to police officers. The collective bargaining agreement mandated that the City of Boston pay officers for certain overtime shifts despite the amount of time worked.  In many cases, the overtime, as directed by the collective bargaining agreement, allotted four hours of overtime pay even if only one hour was worked.  This was clearly laid out in the trial where fellow officers were found not guilty of the exact same charges and conduct to which Ms. Lopez pled guilty.

---

[1] The Defendant was grouped with twelve other defendants, four of whom took the matter to trial.  Those four defendants were acquitted of the same offense for which the Defendant pled guilty were Timothy Torigian, Robert Twitchell, Kendra Conway and Henry Doherty. The other defendants who were charged but pled guilty were Joseph Nee, William Baxter, Michael Murphy, Thomas Nee, Gerrard O'Brien, George Finch, Craig Smalls and Diana Lopez.

Third, while Ms. Lopez pled guilty to the overtime abuse, the culture of the department as sanctioned by supervisory personnel is largely responsible for the violations. One must remember that Ms. Lopez was a soldier taking orders from her superior officers to leave early once her work was done. This conduct began prior to her tenure in the Evidence Control Unit and was condoned by every person who assumed a supervisory role of that unit. Ms. Lopez was never in a position to challenge the directives of her superior officers. Had she balked, she would have been isolated by her fellow officers and not considered to be a team player. She did as she was told. And now suffers the consequences for it.  To put it simply, she was but a 'cog' in the wheel of corruption.

In paragraph 49 of the PSR, the government indicated that Ms. Lopez in her testimony at the trial of Richard Evans denied having any intent to commit a crime and was forced to cooperate and plead guilty[2]. That proposition is false! Now that she testified and said things the government did not like, it tries to penalize her by characterizing her testimony in a false light. The bad faith of the government is highlighted by the fact that it submitted to probation two pages of Ms. Lopez's testimony in the Richard Evans trial out of a total of thirty-four pages. At no point during her testimony did she deny that there was a factual basis for her guilty plea.  Indeed, she answered every question posed to her truthfully.

The question posed to her at Evan's trial was how she "felt" at the time she was submitting the time slips.  Taking her testimony out of context was disingenuous.  During the proffer sessions with the government, Ms. Lopez, after consultation with her counsel and meetings with the United States Attorney's Office and related law enforcement personnel realized that what she had done was larceny from the beginning, admitted so and decided to plead guilty

---

[2] Richard Evans was tried separately from the group mentioned in footnote 1.  He was found guilty of his offenses on or about March 14, 2024. Richard Evans has yet to be sentenced but acted in a managerial role in the Evidence Control Unit.

of her own volition. She admitted to her involvement during her testimony. Consequently, the

government has determined that it will not provide Ms. Lopez with a substantial assistance

motion even though (a) she testified at the grand jury, (b) and testified on behalf of the

government against four fellow officers at trial. Despite all her cooperation and assistance, the

government, in a moment of pique, has now turned its back on its own witness because they

failed to convict those four officers, and is refusing to provide her with a substantial assistance

5K1.1 motion.

It is quite interesting to note that the government knowing Ms. Lopez who was lawfully

subpoenaed by the defendant Evans was a government witness in a prior trial regarding the same

issues, yet never attempted to contact Ms. Lopez' counsel about her testimony which it had every

right to do. The government apparently had no qualms about Ms. Lopez testifying as a defense

witness until she testified as to how she **'felt' when she was submitting the overtime slips. In**

**fact, in the proffer sessions with the government, Ms. Lopez told assistant United Attorney**

**Mark Grady that she initially did not feel that she was doing anything wrong because everyone**

**did it and the numerous supervisors she worked under all sanctioned the practice.**

The government's actions are similar to what the United States Supreme Court

condemned as impermissible in the case of *Santobello v. New York*, 404 U.S. 257 (1971).

Santobello, after negotiations with the prosecutor withdrew his previous not guilty pleas to two

felony counts and pled guilty to a lesser included offense. The prosecutor agreed to make no

recommendation at sentencing. When the sentencing hearing took place, there was a different

prosecutor in place and that prosecutor recommended the maximum sentence. The judge (who

stated he was uninfluenced by the prior recommendation) imposed the maximum sentence. The

Court at page 262 in speaking about guilty pleas said "...the adjudicative element inherent in

accepting a plea of guilty, must be attended by safeguards to ensure the defendant what is

reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that, when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled". Id. at 262.

As noted earlier, Ms. Lopez went to numerous proffer sessions with the Government, testified at grand jury proceedings and testified as a government witness at trial all based upon the understanding that she would receive a substantial assistance motion. It is not Ms. Lopez' fault that the four defendants in the trial at which she testified were found not guilty. If the Court reads the thirty-four pages of testimony submitted to Probation by counsel for Ms. Lopez, it will see that Ms. Lopez never said the government coerced her into pleading guilty. Indeed, this Court took her plea and should remember that she was straight forward in admitting her guilt. Ms. Lopez is not asking that the guilty plea be vacated. She is asking the Court to sentence her to a period of probation, which would be the just and proper thing to do because of her cooperation with the government.

## ARGUMENT

A criminal penalty must be "sufficient, but not greater than necessary, to comply with the purposes of sentencing." 18 U. S. C. Section 3553 (a). Here, fair consideration of the offense considering Ms. Lopez's history and characteristics compels the conclusion that a period of probation along with restitution, statutory fines and fees be imposed.

The Court is required to compute the guideline sentencing range as a "starting point and the initial benchmark." *Gall v. United States*, 528 US 38, 49 (2007). Although probation takes the position that the advisory GSR is 18 to 24 months, Ms. Lopez contends that the properly calculated GSR is less than that.

Whatever GSR the court adopts, the guidelines are not the sole factor, nor even the first among the many factors that Congress has commanded the courts to apply in reference to section 3553(a).  Courts "may not presume that the guidelines range is reasonable", rather they must "make an individualized assessment based on the facts presented" and "consider sentences other than imprisonment." *Gall*, 528 US at 50, 59; also see *Nelson v. United States*, 555 US 3:50, 352 (2009) (per curium) ("Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."). In doing so, the Court must consider whether the Sentencing Commission's underlying policy results in an advisory GSR that is unreasonably high. *See United States v. Kimbrough*, 552 US 85, 109 (2007); *United States v. Boardman*, 528 F.3d 86, 87 (1ˢᵗ Cir. 2008); *United States v. Martin*, 520 F.d 87, 93-94 (1ˢᵗ Cir 2008).

Elaborating on the meaning and breadth of the "parsimony principle," the First Circuit stressed that *Kimbrough* requires a "more holistic inquiry" and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs a thread of an overarching principle." *United States v. Rodriguez*, 527 F.3d 221, 228 (1ˢᵗ Cir. 2008). That overarching principle is to "impose a sentence sufficient but not greater than necessary" one that is "minimally sufficient to achieve the broad goals of sentencing." Id. (emphasis added).

Probations proposed calculation is erroneous for the following reasons:

### A.  Ms. Lopez Should Only Be Held Accountable for Improper Overtime Paid To Her.

Ms. Lopez objects to being held accountable for the collective loss comprised of allegedly improper overtime paid to all officers in the Evidence Control Division because she did not direct other officers to submit false timesheets; She did not direct other officers when to start and stop their shifts, and as the government itself has acknowledged, she "did not approve timesheets" of other officers.

Probation is incorrect in U. S. S. G. Section 1B1.3 providing that, in the case of "jointly undertaken criminal activity", a defendant is responsible for the conduct (acts and omissions) of others" that was "reasonably foreseeable." There are several problems with the blind application of that deceptively simple principle to the facts of this case.

First, even if we assume that it was foreseeable to Ms. Lopez that other officers in her unit and elsewhere in Boston Police Department were engaged in overtime abuse, the conclusion that the aggregate dollar value of loss was also foreseeable requires an unsupported inferential leap. It also has no logical limit and will potentially make each individual officer "responsible" for the loss gross value of improper overtime paid to every other member of the Boston Police force.

Second, based on the trial evidence in this case, the underlying conspiracy attempted to be proven was more in the nature of a "hub and spoke" conspiracy with Timothy Torigian and other supervisors at the center and each officer in the unit comprising a separate "spoke" rather than a "chain" conspiracy connecting all the members to each other. See generally *Kotteakos v. the United States*, 328 U. S. 750 (1946) (distinguishing types of conspiracies). In other words, Torigian and other supervisors directed members of the unit when to start and stop work. Members of the unit submitted their time records to Torigian and others for approval and payment of overtime. While each member of the unit may have been aware that all of them were engaging in similar conduct, there was no necessary agreement amongst them, and each is only properly accountable for his/her own "spoke" in the wheel. Accordingly, Ms. Lopez should only be accountable for the tainted overtime actually paid to her $36,254 as opposed to the $253,389 allegedly involved in the entire overtime schedule alleged in the indictment.

Co-defendants Twitchell, Torigian, Conway and Doherty were found not guilty of the same counts that Ms. Lopez has pled guilty to. They were alleged to be individually responsible for the following amounts:

| Torigian | $38,882.14 |
| Twitchell | $25,644.80 |
| Doherty | $25,353.80 |
| Conway | $16,470.24 |
| **Total** | **$104,550.98** |

The above referenced individuals were found not guilty of Conspiracy to commit theft and theft. Accordingly, if they were determined to not have stolen the money, it had to have been paid to them lawfully. Therefore, the specific offender characteristic if we were to accept the determination by probation would be reduced by $104,550.01 for **a total loss of $125,359.01**. That would equate to 8 points if accepted as appropriate in this matter. More importantly, since four of Ms. Lopez's alleged "co-coconspirators" were acquitted of the same offenses, it is not practical or logical to hold her responsible for losses which a jury determined were not criminal.

We calculate Ms. Lopez' loss exposure two ways. The first is that she is only responsible for that amount which she, actually, received. The second is one in which she is held responsible for a total loss of $125,359 (which we don't agree with).

### B.  Diana Lopez Was Not in a Position of Public or Private Trust

Probations proposed application of the abuse of trust enhancement is also erroneous. Of course, every fraud or theft offense necessarily entails an abuse of trust in some vernacular sense. To have any meaning, this guideline enhancement must be construed to apply in a narrower subset of cases. While it is true that Boston police officers inherently occupy a position of trust in society, there is no evidence in this case that this position of trust significantly facilitated the commission or concealment of the offense as the guideline requires. Put another way, the nature of the offence conduct here is no different than that of a private sector employee who improperly

obtains overtime payment. *United States V. Chandler* 732 F3d, 434, 439, (rejecting enhancement applied to police officer because a defendant status as a police officer, standing alone, is not justified reason to increase a sentence... "There is no evidence in the record that defendant used or exploited her position as a police officer or used any knowledge or skill she gained from that position, to commit the offense or attempt to hide it.") Ms. Lopez was not in a position of authority. She was a patrol officer, the lowest rung on the Boston Police hierarchy of authority. In actuality, her position in the Evidence Control Unit was tantamount to that of a store clerk who falsified her overtime records.

Section 3B1.1 pertains to individuals who are normally characterized by professional or managerial discretion. These are employees who "ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature". *See Application Notes of 3B1.1.* "This adjustment does not apply in the case of embezzlement or theft by an ordinary bank teller or hotel clerk" because such positions are not characterized by the above-described factors. Id. In order to be responsible for this enhancement a defendant must be in a managerial position of trust and must have contributed in some significant way to the loss. Ms. Lopez was not a manager and had no discretion or authority to direct fellow workers to submit false time slips.

The correct offense level computation is as follows:

| Base Offense Level | 6 | 6 | |
|---|---|---|---|
| Specific Characteristic | 4 | 8 | |

| | | | |
|---|---|---|---|
| Early Acceptance Responsibility | -2 | -2 | |
| Zero Point Criminal History | -2 | -2 | |
| Acceptance of responsibility | -1 | -1 | |
| **Total Offensive level** | 5 | 9 | |
| **Guidelines Range** | 0-6 | 4-10 | |

## C. The "Loss" Guideline, § 2B1.1, Yields An Excessive Advisory GSR

The proposed "loss" guideline in this case, driven by the total improper overtime across all members of the Evidence Control Unit, bears little rational relation to Ms. Lopez's individual culpability, for the reasons described above.

More generally, the structure of the "loss" or "fraud" guideline, See U.S.S.G. §2B1.1, and the decision to employ numerical notations of financial loss to measure moral culpability, have long been criticized by courts and commentators. See, e.g. *United States v. Parris*, 573 F.Supp.2d 744 (E.D.N.Y. 2008)(concluding that the lost guidelines "have run to amok that they are patently absurd on their face" and impose a sentence 25 years below the low end of the guidelines); *United States v. Adelson*, 441 F.2d 506, 509 (S.D.N.Y 2006) (criticizing "inordinate emphasis" on loss as a measure of culpability unexplained by sentencing Commission); *United States v. Ranum*, 353 F. Supp.2d 984, 990 (E.D. Wis. 2005) (observing that "[o]ne of the primary limitations of the guidelines, particularly in white collar cases, is their mechanical correlation between loss and offense level"); *United States v. Emmenegger*, 329 F. Supp.2d, 416, 427-28 (S.D.N.Y. 2004) (recognizing that the "loss" guidelines "place undue weight on the amount of loss involved in the

fraud," which is "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

The problem of high GSRs, with weak and unexplained correlation to the sentencing goals of section 3553(a), has been exacerbated by the "unplanned upward drift" of white-collar sentences in recent years. See Frank O. Bowman III, *Pour Encourager Les Autres? The Curious History And Distressing Implications Of The Criminal Provisions Of The Sarbanes-Oxley Act And The Sentencing Guidelines Amendments That Followed*, 1 Ohio State J. Crim. L. 373, 387 (2004). In particular, the loss guidelines fail to measure a host of factors that may be important and serve as basis for mitigating punishment. See Allan Ellis, John Steer, Mark Allenbaugh, *At A Loss For Justice: Federal Sentencing For Economic Offences*, 25 Crim. Just. 34, 37 (2011); See also United States v. Ovid, 09-CR-216 (JG), 2010 U. S. Dist. Lexis 105390, at *4 (E.D.N.Y. Oct. 1, 2010) ("The fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so").

Sentencing Commission data also reflects what can only be described as broad judicial discomfort with imposing guideline sentences in cases under fraud Guideline. In Q1 of 2024, for example, within-Guideline sentences were imposed in just 40.1% of fraud/ theft/ embezzlement cases. See United States Sentencing Commission, Quarterly Data Report (1st Quarter release 2024), Table 10.  Meanwhile sentences reflecting a downward (non-cooperation) or variance comprise 32.4% of such cases. See id. Finally, the Sentencing Commission interactive Data Analyzer indicates that, for the last 5 fiscal years, nationwide, defendants in Criminal History Category I sentenced under §2B1.1 receive a sentence of "probation" or "probation and alternatives" 31.3 percent of the time.

According to Ms. Lopez's PSR the total loss is calculated to be $253,389, which is at the lowest end of the scale. Just $3,390.00 places her in a loss category that adds months to a potential sentence and to the advisory guidelines. This seems arbitrary considering her narrow involvement in a scheme that was pervasive throughout the years and condoned by supervisory staff.

### D. Just Punishment For Diana Lopez Does Not Require Incarceration

Even a short sentence of incarceration in federal prison would be unnecessary to adequately reflect the seriousness of the offense of conviction and Ms. Lopez's participation in the crimes involving Boston Police Department's overtime abuses. A probationary sentence will promote respect for the law and provide "just punishment" as required by section 3553(a)(2)(A).

While it is easy to become inured to enormous custodial sentences in the federal system, a federal felony conviction is, itself, a severe penalty, particularly for the nonviolent offense by an individual with whom no criminal history exists. Ms. Lopez has endured, and will continue to suffer, humiliation, stress, and financial burdens, including the likely loss of her pension, that she scarcely could have imagined before.

Courts also have recognized that the myriad severe collateral consequences attached to a federal felony conviction, can amount to a kind of, civil death. *United States v. Nesbith*, 188 F Supp. 3d 179, 181 (EDNY 2016) (lengthy opinion detailing collateral consequences of conviction and imposing non incarceration sentence). Ms. Lopez would also face unique risk of harm in prison as a former law enforcement officer. See *United States v. Koon*, 518 US 81, 89 (1996) (affirming downward departure, in pre-Booker "mandatory" Guidelines era, made on basis that defendant law enforcement officers "were particularly likely to be targets of abuse in prison").

Moreover, probation supervision is a meaningful punishment. The Supreme Court noted, in *Gall*, that probation supervision amounts to a "substantial restriction of freedom." 552 U.S. at

15 |

595. As now retired Judge Nancy Gertner observed in one of the first sentencing hearings

conducted after *Gall*:

> [P]robation is not nothing, that there are substantial restrictions on an individual's freedom in probation, that we can structure a probationary sentence that meets all the purposes of sentencing, and that is entirely appropriate. This was one of the things that the guidelines ignored, and the guidelines dramatically changed from pre guideline practice and which the Supreme Court is essentially saying we can now look at again.

*United States v. Ramos*, No. 04 -CR-10275 (D. Mass 2008) (D.E. 62) (ordering probationary

sentence for substantial oxycontin trafficking).

### E.   A Sentence of Incarceration Would Create Unwarranted Disparity

A sentence of any incarceration in this case would create unwarranted disparity, contrary to

the statutory command of 3553 to "avoid unwarranted disparities among defendants with similar

records who have been found Guilty of similar conduct" 18 U.S.C. section 3553 (a)(6). Federal

sentences of other Boston police officers convicted of overtime fraud offenses confirm that any

proposed sentence of incarceration in this case would be unreasonable. Joseph Nee received a

sentence of two years' probation, a $2,000.00 fine and restitution of $12,636.00. William Baxter

was sentenced to time served (one day), a $20.000.00 fine and $9,223.00 restitution and two years

of supervised release. Michael Murphy received a similar sentence to Nee and Baxter. Ms. Lopez

stands in the exact same position as these defendants who pled guilty to the offenses charged.

The government has no principled reason to distinguish Ms. Lopez from those defendants.

### F.   The Court Should Apportion Restitution

Even if the court determines that miss Lopez may be held liable for the entire loss across all

members of the charged conspiracy the court has expressed statutory authority to apportion loss

among the defendants:

> if the court finds that more than one defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution *or may apportion liability among the defendants to*

16 |

*reflect the level of contribution* to the defendant's loss and economic circumstances of each defendant.

18 U.S.C. 3664 (h) (emphasis added).

Here, the court should apportion $36,254.00 to Ms. Lopez the amount of improper overtime payments to her with the remainder apportioned to all other defendants based upon their individual culpability. Ms. Lopez did not benefit from or contribute to the overtime loss beyond the amount paid to her personally, even as the acquitted members of the 'conspiracy' face no criminal restitution consequence whatsoever.

## CONCLUSION

For the foregoing reasons, the court should impose a two-year probationary sentence, a fine and restitution in the amount of $36,254.

Respectfully submitted,

Diana Lopez
By Her Attorney,

__/s/ *James S. Dilday, Esq.*__ ____
James S. Dilday, Esq. (12345)
Anthony R. Ellison, Esq. (567037)
299 Gallivan Boulevard
Boston, MA 02124
Tel. (617) 506-7057
Fax (617) 506-7175
Cell (617) 642-0689
Email: jamessdilday@gmail.com
          arellisolaw@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the notice of electronic filing in EF and paper copies will be sent to those indicated as non-registered participants on July 31st, 2024.

_/s/ Anthony R. Ellison_____
Anthony R. Ellison, Esq.