UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

5. DIANA LOPEZ,

Defendant

No. 20-cr-10164-NMG

**GOVERNMENT'S SENTENCING MEMORANDUM**

For the reasons stated below, the government respectfully requests that the Court sentence the defendant to a low-end guideline sentence of eighteen months' incarceration followed by three years of supervised release, a fine within the guidelines sentencing range (unless the court finds she cannot pay), restitution of $36,028, and a $200 special assessment.

## FACTS

### Background - Diana Lopez

Lopez became a Boston Police officer in 1985. Initially, she worked in the Brighton, Dorchester, and South Boston Districts as a patrol officer. From 1991 to 1992, she taught in the DARE Program at a school in Jamaica Plain. From 1992 to 1995, she taught in the BPD Academy. From 1995 to 2004, Lopez worked in BPD Headquarters as a clerk for the internal affairs unit. Lopez then worked in the Hyde Park District for one year before coming to the Evidence Warehouse in 2006.

**The Evidence Warehouse**

The Boston Police Department leases two buildings located at 1555 Hyde Park Avenue in Hyde Park which serve as the Boston Police Evidence Warehouse. Sworn police officers assigned to the warehouse, which include approximately ten members of the Evidence Control Unit ("ECU"), work from 7:30 a.m. to 4:00 p.m. Mondays through Fridays. The members of the ECU include a Lieutenant or Captain, two Sergeants, and five or more police officers.

The members of the ECU control access to the warehouse and their duties include: storing and cataloging new evidence, including drug evidence, retrieving evidence for use in court, and transporting the evidence when necessary.

**Purge Overtime**

In or around 2011, the ECU ran out of space for new evidence. The BPD consequently approved a program called "purge overtime," which allowed ECU officers to work an overtime shift to dispose of old and unneeded evidence, organize the evidence at the warehouse more efficiently, scan older evidence into newer computer systems so that it can be tracked more effectively, and thereby create space for the intake of new evidence. This purge overtime shift ran from 4 p.m. to 8 p.m., most often Monday through Thursday, and was performed by four or more ECU line officers (patrolmen/patrolwomen) and one or more supervisors (either a sergeant, lieutenant, or captain). Because purge overtime followed the officers' regular shift, it was paid on an hour-for-hour basis, in 15-minute increments. Additionally, because purge overtime required officers to manually sort evidence, purge overtime could not be performed remotely.

Overtime hours are reported using an overtime slip, an example of which is shown below, which requires officers to state their name, overtime purpose, start time, end time, and actual hours worked. The overtime slips must be signed by the employee working overtime as well as

the supervisor and commander, and an overtime slip must be submitted for each and every overtime shift. Notably, BPD's overtime slip—in bold and underline—asks BPD employees to list the "Actual Hours Worked" for each overtime shift:

**BOSTON POLICE**
OVERTIME AUTHORIZATION/RECORD

Employee's Name (Last & First Name): LOPEZ DIANE | I.D. NO.: 009370 | Rank: 09 | Unit Assigned-Org Code: 32020 | OT CODE: 320
Overtime Purpose (Activity/Event): PURGE | Overtime Location: ECU | OT Call Sign: SE03
Employee Replaced (Last Name) | I.D. NO. | Authorized By (Last Name) | Rank | I.D. NO.
Start Time (Military/24Hr. time): HR. 16 : MIN. 00 | End Time (Military/24Hr. time): HR. 20 : MIN. 00 | **Actual Hours Worked:** HR. 04 : MIN. 00 | Double Time: ☐
Start Date (MM/DD/YYYY): 10/04/2018 | End Date (if different) (MM/DD/YYYY): / / | Employee Signature
Supervisor Certifying Time Worked (Last Name): TORIGIAN | I.D. NO.: 009847 | Rank: 05 | Supervisor Signature
Commander/Director Authorizing Payment/or designee (Last Name): TORIGIAN | I.D. NO.: 009847 | Rank: 05 | Commander/Director or designee Signature
District/Unit/Source Charged-Org Code: 32000

Form# 0003-BAT-0504

On this particular day, October 4, 2018, Lopez (along with others performing the "purge" overtime) is representing that she worked 4–8 p.m. (1600-2000), in the warehouse "ECU," and that she "actually worked" 4 hours of overtime. Contrary to what was represented in this overtime slip, the alarm records show that Lopez and the other officers left at 5:16 p.m. PSR, ¶21.

**BPD Warehouse Alarms**

The BPD Warehouse is extensively alarmed, with alarms on each outer door, separate alarms on various trailers and safes within the building, and, internal motion sensors. Once the perimeter alarm is set, any person inside the building would either trigger the motion sensors, or, would have to disarm the alarm in order to exit the building. Data from the alarm system, including when it was set and disarmed on a given date, and by whom, was maintained by the City of Boston.

**The Criminal Conspiracy**

From at least January 2015 through in or about February 2019, Lopez and co-conspirators

conspired to be paid for hours they did not work by submitting false and fraudulent overtime slips in which they claimed to have worked a full "purge" overtime shift when in fact they did not. Supervisors in the ECU, such as Captain Richard Evans, Timothy Torigian, and Sergeants George Finch, Robert Twitchell, and Gerard O'Brien, routinely agreed to endorse overtime slips for themselves and their subordinates certifying that they and their subordinates had worked a full four hour "purge" shift when the supervisors knew that they had not done so. PSR, ¶20.[1]

From at least January 2015 through February 2019, which is the relevant time period in which Lopez was assigned to the Warehouse, Lopez and the officers of the ECU submitted thousands of false and fraudulent overtime slips in which they claimed to have worked a full four hour "purge" shift, despite the fact that the Warehouse perimeter alarm was set well before the end of the shift. Though supervisors knew that these overtime slips were false, supervisors endorsed the false and fraudulent overtime slips.

**Government's Loss Calculation**

The loss attributed to individual officers was calculated by comparing the hours claimed in purge overtime slips to the times that the alarm records show the officers actually stopped working.[2] During the conspiracy, spanning from at least January 2015 through February 2019, the members of the conspiracy were paid approximately $386,766 for hours that were not worked. Exhibit 1. Based upon a comparison of the overtime hours claimed versus the time that the building alarm was set, from January 2015 through February 2019, Lopez personally

---

[1] Lieutenant Torigian, Sgt Twitchell, and two other charged officers were acquitted after trial.

[2] This methodology was laid out in testimony before this Court, and in a second trial. *See* Case No. 20-10164-NMG [D. 386], Trial Transcript, p. 35-64; Case No 21-10093-RGS [D. 122], Trial Transcript, p. 17-65.

received approximately $36,028 for overtime hours that she did not work.[3] Since Lopez was present during the entirety of the charged period, the government views her as responsible for the full $386,766 pursuant to USSG § 1B1.3. For purge shifts that Lopez personally attended during that time period, the loss to BPD was $258,389.

**Advisory Sentencing Guidelines**

**A. Government's Calculation**

The government's position with respect to the Sentencing Guidelines is as follows:

a) Defendant's base offense level is 6, because the offense of conviction has a statutory maximum term of less than 20 years (USSG § 2B1.1(a)(2));
b) Defendant's offense level is increased by 12, because the reasonably foreseeable loss is greater than $250,000 but less than $550,000 (USSG § 2B1.1(b)(1)(G));
c) Defendant's offense level is increased by 2, because defendant abused a position of trust, (USSG § 3B1.3);
d) Defendant's offense level is decreased by 3, because Defendant has accepted responsibility for Defendant's crimes, and has timely notified authorities of her intention to plead guilty thereby permitting the government and the Court to allocate their resources efficiently (USSG § 3E1.1); and
e) Defendant's offense level is further reduced by two levels because she is a zero point offender. (USSG § 4C1.1).[4]

The government has calculated the total offense level to be 15. Lopez's criminal history category is I, which results in a GSR of 18-24 months' imprisonment.

**B. Probation's Calculation**

Probation's calculation differs from the government's in one material respect. PSR, Objections, p. 31. Probation has concluded that the entirety of the loss during Lopez's tenure

[3] This represents the second highest amount of individual loss among the conspirators. *See* Exhibit 1.

[4] The government's plea agreement predates the adoption of the "zero point" Guideline, USSG §4C1.1. The government agrees with Probation that Lopez qualifies for treatment under that Guideline.

cannot be attributed to her. Instead, Lopez could only reasonably foresee fraud of co-conspirators occurring on days when Lopez actually worked, and left early from, a purge shift. PSR, Objections, p. 31. The total amount of loss attributable to Lopez for losses incurred during shifts that Lopez, herself, worked, has been calculated to be $258,389.

Despite this difference, Probation's calculation of the GSR mirrors that of the government, (TOL 15 – CHC I – 18-24 months).

**C. Defendant's Objections**

The Defendant objects to: (1) the loss calculations of both Probation and the government, arguing that Lopez should only be held accountable for the amount she personally obtained ($36,028);[5] (2) the attribution of loss for defendants: Torigian ($42,931), Twitchell ($25,644), Doherty ($25,875), and Conway ($16,479), because those defendants were acquitted at the trial before this Court; and (3) the Position of Trust enhancement. PSR, Objections, p. 32-35.

[5] The Defendant has cited a figure of $36,254. The government has limited its individual loss figure to that stated in the Plea Agreement.



7

[redacted] She did, however, participate in trial preparation in early 2023, and, testified before this Court in April of 2023. In so testifying, Lopez withstood aggressive cross examination, did so in front of other officers, and family members of the defendant. *See United States v. Torigian et al*, 20-10164-NMG [D. 369], Trial Transcript, p. 65-97; [D. 376], Trial Transcript, p. 7-55. Lopez testified that she and the other officers routinely left early from the purge and kiosk overtime shifts and lied about it. Lopez also explained that she would often complete the overtime work during her regular shift so that she could leave earlier. [D. 369], p. 79. She also testified that officers in the ECU began staying until 8p.m. in response to learning of a possible investigation of their conduct in May 2016. *Id.*, 83.[9]

**E. Lopez's Testimony in *U.S. v. Evans*, 21-cr-10093-RGS**

Following the trial before this Court, another related trial, that of former Captain Richard Evans, went forward before Judge Stearns in March of 2024. Rather than assist the government, in that case, Lopez chose to testify against the government on behalf of the defendant. Case No. 21-10093-RGS [D. 122]. During that testimony, Lopez denied having intent to commit any crime and further testified that the government had threatened her children and her relationship with her children during discussions leading to her guilty plea. Case No. 21-10093-RGS [D. 122], p. 87-89.[10]

---

[redacted]

[9] A copy of that testimony is attached as Exhibits 2 and 3.

[10] A copy of that testimony is attached as Exhibit 4.

# ARGUMENT

## I. Guidelines Calculations

### A. Loss Amount

The government believes that a loss amount of $386,766 (out of the total conspiracy wide loss of $386,766) is appropriately attributed to Lopez based upon the loss to BPD resulting from the purge overtime scheme during the charged period. Probation has taken a narrower view. Probation does not believe that loss occurring pursuant to this scheme on days that Lopez did not work a purge overtime shift can be attributed to her as "reasonably foreseeable." In declining to attribute the remaining loss, Probation relates, "[t]here is insufficient evidence to hold the defendant accountable for loss that wasn't specifically known to her or reasonably foreseeable to her." PSR, Objections, p. 31. Instead, Probation believes that fraudulent overtime slips submitted by co-conspirators on days when Lopez worked, represent foreseeable loss (a figure of approximately $258,389). *Id.*

The government believes that Probation has applied the "reasonably foreseeable" standard too restrictively in this matter. Based on the facts, both the Guidelines and caselaw dictate a conclusion that the losses attributable to Lopez's co-conspirators during her time participating in the conspiracy represent jointly undertaken criminal activity, which was within the scope of the agreed criminal activity, occurred in furtherance of that agreed criminal activity, and were reasonably foreseeable to Lopez.

As a starting point, this charge involves a conspiracy, the very definition of a jointly undertaken criminal activity, or, as the Guidelines provide, "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others." U.S.S.G. § 1B1.3(a)(1)(B). In the case of jointly undertaken activity, the court "must make an individualized determination

regarding the amount of loss attributable to, or reasonably foreseeable by, a defendant." *United States v. Codarcea*, 505 F.3d 68, 72 (1st Cir. 2007); USSG §1B1.3(a)(1)(B). "This task requires the court to ascertain what activity fell within the scope of the specific conduct and objectives embraced by the defendant's agreement. The court must then determine to what extent others' acts and omissions ... would have been foreseeable by a reasonable person in defendant's shoes at the time of his or her agreement." *Id*. *See also, United States v. Delima*, 886 F.3d 64, 73 (1st Cir. 2018).

With respect to the scope and objectives of the agreement, Lopez agreed to engage in a scheme with her co-conspirators to defraud the BPD utilizing fraudulent purge overtime submissions made during her tenure at the Evidence Warehouse, which lasted from at least January 2015 through February 2019. The conduct at issue, the submission of fraudulent overtime slips by co-conspirators during Lopez's tenure, "f[a]ll[]s within the scope of the specific conduct and objectives embraced by the defendant's agreement." *Cordaracea, supra*. The fraudulent overtime slips, whether submitted by Lopez, or, someone else, were submitted in furtherance of the conspiracy they all joined.

She was assigned to the Warehouse in 2006, and was present when the "purge" overtime began in 2011. Lopez was present at the inception of the purge scheme, and she was a participant until it was brought to an end in February 2019. Testimony at the trial before this Court revealed that, as early as 2011, Lopez was one of the individuals who would explain to new arrivals how the scheme worked. Trial Day 6, [D. 385], p. 35-37.[11] The members of the ECU, both supervisors and officers, were aware of the hours and frequency of the purge overtime shift (Mon.-Thurs., 4-8pm). Officers and supervisors participating in this conspiracy were aware

---

[11] This testimony is attached as Exhibit 5.

that they were consistently working two hours or less of those shifts, but lied about it. All of the participants were aware that everyone was leaving early. And this conduct occurred on hundreds of occasions, over years. This was one unit, working at one single location, engaged in the same scheme to steal money from the BPD by submitting fraudulent overtime slips for the 4-8pm purge overtime shift. Lopez's familiarity with the conspiracy's goals and methods are exactly the type of evidence that supports a finding of "reasonable foreseeability." As observed by the First Circuit, emphasis in original:

> foreseeability may be established … by a defendant's knowledge of *the nature and extent of a conspiracy in which he is involved*. … It is both good law and good logic that a defendant's awareness of the inner workings of a conspiracy in which he is participating is germane to, and often highly probative of, accomplice attribution. Although appellant may choose to characterize such intimate knowledge as "mere awareness"-a term that we view as verging on the oxymoronic in a case like this one-he is fishing in an empty stream. Such knowledge frequently will suffice to prove the defendant's ability to foresee the acts of coconspirators.

*United States v. LaCroix*, 28 F.3d 223, 229 (1st Cir. 1994) (emphasis in original). It was eminently foreseeable to Lopez that her co-conspirators, working exactly the same overtime purge shifts, at exactly the same location, often with exactly the same co-conspirators, would engage in exactly the same conduct that Lopez herself did with them, i.e., leaving early from the purge shift and collectively lying about it.

It is difficult for the government to believe that Lopez did not know, let alone that Lopez could not reasonably foresee, that her co-conspirators would do exactly what they did with Lopez and exactly what they all agreed to do with each other. Lopez testified that lying on slips was the generally accepted practice. *See, e.g.*, Exhibit 3 [D. 376], p. 14-15. It makes little sense to the government to believe that Lopez, leaving purge shifts with her co-conspirators on Monday and Thursday on a given week at 6pm, could not foresee that those same co-

conspirators would also leave at 6pm from the same overtime shift on Tuesday and Wednesday. Especially when she testified that was the general practice, and, when this conduct (and Lopez's own participation in it) occurred on hundreds of occasions, over years.

The evidence in this matter supports the inference that Lopez knew exactly what her co-conspirators were doing (even when she was not present). But that inference isn't even required to support a finding of loss. "Reasonable foreseeability is broader than knowledge." *United States v. Ford*, 73 F.4th 57, 66 (1st Cir. 2023).[12]  In the drug context, the First Circuit has not hesitated to uphold attribution of narcotics sold at a location even where members of a conspiracy were not present on a given day.  "It was *surely foreseeable* to Lugo that his coconspirators would continue to sell drugs at El Faro even on days when Lugo himself was not actively selling." *United States v. Walker-Couvertier*, 860 F.3d 1, 18–19 (1st Cir. 2017) (emphasis added).  Just so, here.

In the view of the government, the fact that her co-conspirators would engage in exactly the same conduct Lopez agreed to engage in with them, *i.e.,* lying about working a full purge overtime shift, was entirely foreseeable – even on days Lopez, herself, did not work.  *See Walker-Couvertier, supra*.  Especially so for an individual who was present through the entirety of the scheme, and who testified that lying was what everyone did.  Thus, this represents conduct: that was within the scope of the agreement Lopez entered into with his co-conspirators, USSG §1B1.3(a)(1)(B)(i); in furtherance of the conspiracy, USSG §1B1.3(a)(1)(B)(ii); and

---

[12] Indeed, in the context of fraud schemes, the First Circuit has upheld a finding that conduct broader than that undertaken by a specific defendant can be foreseeable under Section 1B1.3. *See United States v. Iwuanyanwu*, 69 F.4th 17, 22 (1st Cir. 2023) (concluding that it was reasonably foreseeable to a defendant who used "fraudulent corporate documents to open bank accounts used to perpetrate … fraud" that other members of the conspiracy "could use false identities when opening additional bank accounts in furtherance of the conspiracy.")

wholly foreseeable to Lopez, USSG §1B1.3(a)(1)(B)(iii). The entire loss to the BPD during her tenure from the fraudulent purge overtime submissions should be attributed to Lopez under USSG §1B1.3(a)(1)(B).[13]

B. "Acquitted" Conduct

The government believes that the conduct in furtherance of this scheme undertaken by Torigian, Twitchell, Doherty, and Conway, is appropriately attributed to this defendant. The standard of proof under the Guidelines is lower than that at trial, and, nothing prohibits consideration of acquitted conduct that has been proven by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 156 (1997); *United States v. Cox*, 851 F.3d 113, 121 (1st Cir. 2017).

While there is a pending (not yet enacted) amendment to the Guidelines that would limit consideration of acquitted conduct in certain circumstances, that Guideline would not apply here. That proposed Amendment provides:

> (c) ACQUITTED CONDUCT.—Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction.[14]

---

[13] The specific figures supporting the government's estimate are detailed in Exhibit 1, hereto. The loss was calculated by comparing the hours claimed in purge overtime slips to the times that the alarm records show the officers actually stopped working. *See* Case No. 20-10164-NMG [D. 386], Trial Transcript, p. 35-64; Case No 21-10093-RGS [D. 122], Trial Transcript, p. 17-65. Probation was provided with an unredacted copy. For public filing, the exhibit has been redacted to remove names of uncharged individuals.

[14] The Application Note for the proposed amendment further provides, "[s]ubsection (c) provides that relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct establishes, in whole or in part, the instant offense of conviction. There may be cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction. In those cases, the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct."

That Guideline would only apply if the "defendant" (Lopez) had been acquitted of some conduct. Lopez has not been acquitted of anything. The proposed amendment does not provide that evidence cannot be considered if "*any*" defendant is acquitted. There is simply no conduct here to which the proposed Guideline would, or could, apply.

C. Restitution

The government agrees that the amount of restitution to be paid by Lopez should be limited to the amount she personally obtained ($36,028).

**II. Lopez's Testimony in *US v. Evans***

Despite previously cooperating with the government's investigation of misconduct at the warehouse, Lopez subsequently chose[15] to testify *against* the government in the matter of *United States v. Evans*. Her cooperation agreement required Lopez to assist the government in its whole investigation of the misconduct at the Warehouse. Yet, inexplicably, in the wake of the *Torigian* trial, Lopez chose to actively work against the government.

Stunningly, Lopez does not appear to recognize that testifying against the government is the opposite of providing it assistance. Lopez makes no effort to explain this decision to the Court, or, how testifying against the government represents anything other than undermining, rather than assisting the government.

What's more, at the trial, Lopez offered false testimony concerning the government threatening her children, and her relationship with her children, to induce her to plead guilty. Case No. 21-10093-RGS [D. 122], p. 87-89. The defendant seemingly now claims she never

[15] Evans could not have compelled Lopez's testimony had she not voluntarily chosen to testify. *See, e.g., Mitchell v. United States*, 526 U.S. 314, 325-326 (1999); and *United States v. De La Cruz*, 996 F.2d 1307, 1312–13 (1st Cir. 1993) (holding that individuals who have pled guilty, but not been sentenced, retain the Fifth Amendment privilege).

testified that she had been coerced. *See* Defendant's Memorandum, [D. 459], p. 8.

Notwithstanding such claims, the transcript of the trial testimony is clear:

> Q. Okay. Do you recall that when you were being interviewed by him that -- and the FBI and whoever else, that you indicated that you had no intent to steal when you put in your slips?
> A. No, there's never any intention. I was -- I worked and that was that.
> …
> Q. And you have children or a child?
> A. I have two, yes.
> Q. And they indicated that should you be found guilty of that crime, that you'd lose a lot?
> A. Yes, sir.
> Q. One of the things that you'd lose would be your family, you being with your children, right?
> A. That's correct.
> Q. And how did that impact on you?
> A. It was terrible. It was a heavy weight, yeah.
> Q. Did they also tell you that you'd end up going to jail?
> A. Yes.
> Q. And that would be --
> A. A possibility.
> Q. And that would be terrifying as a police officer, right?
> A. Very.
> Q. So then they told you at some point that you could do something to avoid not being with your kids and not going to jail. And what was that?
> A. I don't know if they said it in that aspect, but, yes.
> Q. Did they ask you to sign a cooperation agreement?
> A. Well, I did sign a cooperation, yes.
> Q. Okay.
> And you did ultimately?
> A. Yes.
> Q. And you pled guilty?
> A. I did.
> Q. Why did you plead guilty if you had no intent to steal?
> A. I -- at the time that's what I had to do.
> Q. To be with your children and not go to jail?
> A. Yeah, that's -- I mean -- my mother.

Exhibit 4, Case No. 21-10093-RGS, [D. 122], p. 87-89.

Claims that the government threatened, or even alluded to, her children in the course of any plea discussion, are unequivocally false. Lopez does not now appear to contend otherwise. In effect, she offers no defense at all to this testimony. When asked whether the government told her she would "lose" her children, or if the government had even alluded to such, Lopez could have truthfully answered, "no." That is not what she chose to do. On this point, the transcript is clear and irrefutable. Indeed, Lopez later admitted on cross-examination that allegations of coercion were simply not true:

> Q. Did you enter freely and agreed freely and voluntarily to plead guilty?
> A. Yes, sir.
> Q. Not because the prosecutors told you or forced you or put a gun to your head, you freely and voluntarily pled guilty, correct?
> A. Yes.

Case No. 21-10093-RGS [D. 122], p. 87-89. Had Lopez simply testified truthfully at the outset, such cross-examination would not have been required.[16]

---

[16] Contrary to her claim that the government had pressured her to plead guilty, Lopez had previously testified (twice) that such had never occurred.

> THE COURT: All right. Has anyone attempted in any way to force you to plead guilty here this afternoon?
> THE DEFENDANT: No, your Honor.

Rule 11 Transcript, [D. 195], p. 7, attached as Exhibit 6. Similarly, at the trial before this Court, Lopez denied that she had been pressured to plead guilty or cooperate:

> Q. Did the government pressure you into pleading guilty, Ms. Lopez?
> A. No.
> …
> Q. Could you have refused to sign this cooperation agreement?
> A. Yes.
> Q. Did the government pressure you into signing it?
> A. No.

[D. 369], p. 69, 72. Lopez's choice to claim that the government threatened her children or that relationship is all the more puzzling in light of this prior testimony.

In her filings, Lopez seeks to sidestep this outrageous testimony, first, denying that it occurred, and, further frames the dispute as one involving government sour grapes because of the outcome of the *Torigian* trial. [D. 459], p. 6-7 ("the government, in a moment of pique, has now turned its back on its own witness because they failed to convict those four officers…"). This second argument, like the defendant's testimony about government coercion, is untethered to reality. This Court, and Probation, are well aware of whether the government has withheld substantial assistance motions from other individuals who testified at the *Torigian* trial. Indeed, notwithstanding the outcome of the *Torigian* trial, every charged individual who has cooperated in this investigation has been the beneficiary of a substantial assistance motion -- except for the individual who: (1) chose to testify against the government; and (2) made false claims of government coercion. Viewed in such a light, it is clear that the outcome of the *Torigian* trial was no factor at all.

## II. Government's Sentencing Recommendation

The factors set forth in 18 U.S.C. §3553(a), including: the nature and circumstances of the offense; the history and characteristics of the defendant; the defendant's attempt to undermine the government's case in the *Evans* trial; and the need for the sentence imposed to reflect the seriousness of the conduct; dictate a low end guideline sentence of eighteen months, a three year term of supervised release, a fine within the Guideline sentencing range calculated by the Court (unless the Court finds that the Defendant is not able to pay a fine) and the payment of $36,028 in restitution to the Boston Police Department.

As this Court has repeatedly noted, police officers have the trust and respect of all law abiding citizens. But with that trust comes a responsibility and obligation to uphold the law.

That this defendant, as a police officer, chose to break, rather than uphold, the law, is indefensible.

The nature of this defendant's role in the offense calls for a significant sentence. Among all of the individuals involved, this defendant participated in the scheme longer than any other defendant. She was present when the "purge" shift began in 2011, and she participated in the scheme until it was brought to an end in 2019. Among all of the officers, she was personally paid for more unworked overtime than anyone besides Lieutenant Torigian. *See* Exhibit 1. In addition, testimony at the trial before this Court revealed that Lopez was one of the individuals who would explain to new arrivals how the scheme worked. Exhibit 5 - Trial Day 6, [D. 385], p. 35-37.

The defendant's conduct in these proceedings further warrants such a sentence. Lopez wishes the benefit of accepting responsibility for criminal conduct, but testified that she did not have any criminal intent. She wishes to benefit from cooperating, after attempting to undermine the government's case in the *Evans* trial. And in attempting to undermine the government's case at the Evans trial, the defendant made false claims of government misconduct in furtherance of her efforts. Even now, Lopez does not seek to apologize or atone for her false testimony, she denies what is plainly present in the transcript, and hurls additional false and baseless allegations of government misconduct, claiming that the government's decision to forego a substantial assistance motion arises from the outcome of the *Torigian* trial, not the defendant's own choice to falsely claim coercion and to undermine the government case at the *Evans* trial.

The issue of payroll abuse by law enforcement has been a recurring one in this Court with many officers of the State Police, Boston Police, and Quincy Police having been convicted of

various forms of payroll abuse.[17]  It has not been enough to simply bring such conduct to light. Prior convictions alone have not deterred (or not sufficiently deterred) such conduct.  Indeed, the conduct in this matter continued, despite a 2018 high-profile prosecution of members of the State Police Turnpike Unit for similar overtime fraud.  This Court, itself, sentenced one of those state troopers.  This history of similar prosecutions highlights the need for this sentence to serve as a general deterrent.  Officers cannot believe themselves immune from consequences for stealing and violating the public trust.

Finally, the government recognizes a number of significant mitigating factors at play in this action, including, most notably, the fact that this defendant testified against other officers. Though the government cannot condone the defendant's choice to reverse course and testify against the government in the *Evans* matter, or, the substance of the false testimony, the Court can certainly consider the prior cooperation in fashioning an appropriate sentence.

---

[17] *See US v. Griffin and Robertson*, 20-cr-10319-MRG (State Police); *US v. O'Brien, Murphy, Carnes and Lopez*, 20-10164-NMG (co-conspirators in BPD); *US v. J. Nee*, 21-10177-PBS (BPD co-conspirator); *US v. Finch*, 21010149-LTS (co-conspirator); *US v. T. Nee*, 21-10294-RGS (BPD co-conspirator); *US v. Smalls*, 21-10192-ADB (BPD co-conspirator); *US v. Raftery*, 18-cr-10203-WGY(State Police); *US v. Cesan*, 18-10383-DPW(State Police); *US v. Herman*, 18-10326-RWZ(State Police); *US v. Chin*, 18-10384-RGS(State Police); *US v. Sweeney*, 18-10286-NMG(State Police); *US v. Wilson*, 18-10290-RGS(State Police); *US v. DeJong*, 18-10307-MLW(State Police); *US v. McAuliffe*, 19-10056-DJC(State Police); and *US v. Corliss*, 16-cr-10250-LTS (Quincy Police).

Even considering any positive factor, for the reasons above, the government believes that a low end guideline sentence of eighteen months of incarceration followed by a three-year term of supervised release, a fine within the Guideline range determined by the Court (unless the Court determines that the defendant cannot pay), along with restitution in the amount of $36,028, represents the appropriate sentence in this matter.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By: /s/ Mark J. Grady
Mark J. Grady
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served via ECF notice.

/s/ Mark J. Grady
Mark J. Grady
Assistant U.S. Attorney